WHITEHILL, Administrator of WHITEHILL *against* WIL-
SON, Executor of WILSON.

### IN ERROR.

The revocation of a levy on the goods of one of two sureties, against whom judg-
ment had been obtained, does not release his co-surety: as between themselves
they are both principals, and the creditor was not bound to pursue his seizure of
the goods of either, for the benefit of the other.

A parol release of a judgment, is sufficient in equity, but a consideration is necessa-
ry to support it. It is not enough that it is in writing, if without a consideration. All
contracts are either by specialty or parol, there is no third class contracts in
writing. If they be merely written, and not specialties, they are parol, and a con-
sideration must be proved.

To leave to a jury the finding of a fact, without the color of proof is error.

ERROR to the court of Common Pleas of *Lancaster* county.

*George Whitehill* and *James Whitehill*, in his life time, on the
31st of May, eighteen hundred and nineteen, obtained judgment by
award of arbitrators, against *Samuel A. Whitehill, John Wilson*,
and *James Boyd*, for six thousand six hundred and forty-nine dol-
lars, upon a bond, in which *Samuel A. Whitehill* was principal,
and *John Wilson* and *James Boyd* his sureties. On this judgment
a *fieri facias*, issued to *April Term*, eighteen hundred and twenty-
one, which was returned on the thirty-first day of December, eigh-
teen hundred and twenty-two, "time given by the plaintiffs."
The court granted a rule to shew cause why this execution should
not be set aside, so far as relates to *John Wilson*, and also why all
other proceedings against the said *John Wilson*, in said cause
should not be stayed, and enjoined, or that an issue be directed, &c.

Subsequently an issue was directed to try "whether by certain
acts of *James Whitehill, John Wilson*, one of the three obligors
in the bond upon which the said judgment was obtained, was not
discharged from the payment of the said bond, and judgment."

This was that issue, framed upon a wager, between *John D.
Wilson*, executor of *John Wilson*, who was then dead as plaintiff,
and *James Whitehill*, Administrator of *James Whitehill*, who was
also dead, as defendant.

It appeared on the trial of the cause, that *James Whitehill*, the
defendant's intestate, on the seventh April, eighteen hundred and
twenty-one, signed and gave to *James Boyd*, the following paper:
"I, *James Whitehill*, hereby certify, that Col. *James Boyd's*
property is free from any levy on my account;" and on the ninth
of April he signed, and gave to the sheriff the following paper
which was filed of record with the execution against *Samuel A.
Whitehill, John Wilson*, and *James Boyd*:

(Whitehill *v.* Wilson.)

"*John Mathiot*, Esq.—Sir,

I wish you to advertise the property of *Samuel A. Whitehill*, and sell as soon as you conveniently and legally can. As he lives at the extreme edge of the county, you will please give such early and timous notice that it may have a general spread. The property of *John Wilson* may remain under levy, so as to make sale the first or second week in June next. The property of *James Boyd* may be considered as not levied on."

A witness testified:

"It was some time in the year eighteen hundred and twenty-one, I was at Judge *Whitehill's* house at *Strasburg*. Knowing that Mr. *Boyd's* property was levied on by Mr. *Whitehill*, and that Mr. *Boyd* was in debt on his own account, I thought proper to state to judge *Whitehill*, that if he could release *James Boyd* with safety to himself, I thought it would be proper and desirable —we had then a free conversation on the subject. I said this in relation to *Boyd* being bail for *Whitehill*, as he was likely to be pressed—we had a free conversation as to the circumstances of *Boyd*, the particulars of which I do not recollect. The object was to impress the propriety of this release, that is so far as I was concerned in it. Some time after this, perhaps six weeks, I was again at Judge *Whitehill's*. He then introduced the subject himself, and said to me he thought he had got that matter fixed about which he was speaking to me in relation to the property of *James Boyd*. I believe that was nearly all; we were speaking in relation to the property of *James Boyd*. I believe I have related all my knowledge of what passed, which I can recollect with sufficient distinctness to give testimony. I believe the amount of the conversation was that *James Boyd* was discharged. *Cross examined*— I do not recollect that he informed me he had a levy on Mr. *Boyd's* personal property—nothing was said about a levy that I remember. This was some time in the year before Judge *Whitehill* died. I think he died in the spring of eighteen hundred and twenty-two.

A paper containing the levy was shewn to the sheriff, who said he thought it was the levy, but that he did not make it himself. His deputy testified:

"I made a levy on the property of *James Boyd;* it was made in April, eighteen hundred and twenty-one, sixth April eighteen hundred and twenty-one. I levied on the personal property that was in the barn and the house; I did not see all the articles, I put them down as Mr. *Whitehill* told me. I think they would sell for three hundred dollars more or less. I did not see all the property levied on. Old Mr. *Whitehill* and Mrs. *Boyd* told me the things to put down. I did not get into one of the rooms at all up stairs.

(Whitehill *v.* Wilson.)

*Cross-examined.—James Boyd* came home while we were there; *Boyd* said if he had been there the levy should not have been made. Mr. *Whitehill* said it made no difference, he had to do it; he had to make a formal levy as he had made one on Mr. *Wilson*. Mr. *Boyd* said it would hurt his credit, they would push other debts. Mr. *Whitehill* said it might be kept a secret. There was no stranger about the house but the minister. Mr. *Mathiot* came, then we got upon our horses and went off. The property might be worth more than three hundred dollars but not at Sheriff's sale. I do not know how many horses there were, I did not see all the horses. I remember a fine stud horse in the stable. I just put down nothing but what he told me."

The sheriff then gave evidence: "No other levy was made on *James Boyd's* property that I know of. I levied on *John Wilson's* property the same day. The defendants in the execution were *Whitehill, Boyd* and *Wilson*. *Wilson's* property was advertised to be sold at three times; first sale to be on the 6th of March. I made a levy on the 6th of April, 1821; that property advertised to be sold on the nineteen of January, eighteen hundred and twenty-two. This advertisement fixes the sale on the nineteenth of September, eighteen hundred and twenty-two. I did not sell on that day; I attended; Judge *Whitehill* was there and his son *Samuel A. Whitehill* and *John Wilson*. Some arrangement was made between the parties to stop the sale. In consequence of entering into a new bond this sale was stopped; a new bond for a balance on an old execution. It included the negro child and some grain. Sale was stopped on this compromise. I do not recollect any objection to the claim either at this time or any other. The return of "time given by the plaintiffs," could not have been made before this. I have no recollection about the time of the return. *Samuel A. Whitehill* was sent for. I do not recollect as to his objecting to entering into the bond. I sold the personal property of *Samuel A. Whitehill; John Wilson* purchased considerable in for him, household and other property.

The court were requested to charge the jury,

1. That the distinction between principal and surety does not cease after judgment obtained on the original security, and that as to subsequent transactions, equity views them with equal favor, and that the distinction is carried throughout from the first inception of the contract, to the final consummation and discharge of the same.

2. But should the court be of opinion that by the judgment obtained on the original security to August Term, eighteen hundred and nineteen, the distinction between the principal and surety by law ceased, yet if the jury from the testimony of the Rev. *A. Babbet*, that the defendant's intestate said "he thought he had

(Whitehill v. Wilson.)

got that matter fixed in relation to the property of *James Boyd*," can fairly infer that the said intestate had released the said *Boyd*, that then the release of *Boyd* would enure to the benefit of both, as well in law as in equity, and the verdict should be for the plaintiff.

3. That if the jury believe the testimony of the Rev. Mr. *Babbet*, that the "amount of the conversation" with defendant's intestate, was "that *James Boyd* was discharged," then as well in equity as law, *Wilson*, the plaintiff's testator, was also discharged and the verdict should be for the plaintiff.

In answer to these points the court charged,

A suit was brought by *George Whitehill* and *James Whitehill*, against *Samuel A. Whitehill, John Wilson* and *James Boyd*, on a bond dated the second April, 1818, for six thousand five hundred and eighty-four dollars and fifty-three cents, payable on the first of April, eighteen hundred and nineteen; being part consideration for a tract of land purchased by one of the obligors, *Samuel A. Whitehill*.

This suit having been arbitrated an award was rendered in favor of the plaintiff, on the thirty-first of May, eighteen hundred and nineteen, for six thousand six hundred and forty-nine dollars.

An execution was issued on this award, and on a motion to set aside the execution so far as related to *John Wilson*, an issue was directed to ascertain whether in consequence of the act and assent done and given by the deceased *James Whitehill, John Wilson* was by law exempted and in equity discharged from the payment of the bond, and from all responsiblity created by it, and said suit instituted upon it. This is the matter you are to try.

It is alleged on the part of the plaintiff that *John Wilson* and *James Boyd* were sureties and not principals in the bond.

In the case of an ordinary money bond as this is, there is no distinction on the face of it between principal and surety. Evidence is admissible to shew, who is the principal and who the surety. By the evidence given in this case it appears that *Samuel A. Whitehill* was the principal, and *John Wilson* and *James Boyd* sureties only.

I had expressed an opinion that the weight of authority was in favor of the principle, that a judgment terminates the relationship between principal and surety; but our Supreme Court having decided that as to subsequent transactions, equity views them with equal favor, I think myself bound by this decision, and must under the authority of a supreme tribunal which has the right of reviewing and correcting the opinions of this court, lay it down as the law, that the distinction is carried throughout.

(Whitehill *v.* Wilson.)

As to the ground, relative to the levy on *James Boyd's* property, it appears from the testimony that a levy had been made upon the personal property of *James Boyd* to the amount of three hundred dollars—that *James Whitehill* gave to Mr. *Boyd* the certificate, and sent to the sheriff the order which has been read in evidence; after the levy had been made, 'the Rev. Mr. *Babbet* called on Mr. *Whitehill,* and the circumstances occurred which have been related to you in his testimony.

We are asked to instruct you that if from the expressions of Mr. *Whitehill,* "he thought he had got that matter fixed in relation to the property of *James Boyd,*" you can fairly infer that the said intestate had released the said *Boyd,* or that the amount of the conversation with defendant's intestate was, that *James Boyd* was discharged, his release would enure to the benefit of both sureties, and *John Wilson's* testator would be discharged, and the verdict should be for the plaintiff.

This would depend upon the subject to which the testator referred. If it were to orders he had given, relieving *James Boyd's* property from the levy, it would be a discharge to *John Wilson* to that amount, and he would be entitled to a credit for it on the judgment. If he had declared and meant to declare, that he had altogether discharged *James Boyd,* it would operate as a discharge to *John Wilson* to the same extent.

If on the whole matter you are satisfied that under the law as laid down, by the acts and assent done and given by the deceased *Jas. Whitehill, John Wilson* was by law exempted and in equity discharged from the payment of the bond, and from all responsibility created by it, and the suit instituted on it, your verdict will be for the plaintiff—otherwise for the defendant.

The verdict being for the plaintiff, the defendant who sued out this writ of error, filed the following errors:

1. The court erred in charging the jury that judgment obtained against principal and surety in a bond, does not terminate the relationship between them; that as to subsequent transactions, equity views them with equal favor; that the distinction is carried throughout.

2. The court erred in charging the jury on the subject of the third point of plaintiff's counsel, and in stating that if *James Whitehill* deceased, in the conversation with witness, referred to orders he had given relieving *James Boyd's* property from the levy, it would be a discharge of *John Wilson* to that amount, and he *(John Wilson)* would be entitled to a credit for it on the judgment, and that "if he *(James Whitehill)* declared and meant to declare that he had altogether discharged *James Boyd,* it would operate as a discharge to *John Wilson* to the same extent."

52

3. Whether the acts and declarations of *James Whitehill* amounted to a discharge of *Wilson* or not, is a question of law for the decision of the court. The court therefore erred in allowing the jury to draw *this inference*—particularly in answer to plaintiff's third point, allowing the jury from the evidence of the Rev. Mr. *Babbett*, viz. ("he thought he had got that matter fixed in relation to the property of *James Boyd*,") to apply and put their own construction on the said evidence, and to decide and say whether it amounted to a release of *Wilson* or not, either *in part* or *in toto*, which was a matter for the decision of the *court alone*, and ought not as in the conclusion of the charge to have been left to the jury.

*Jenkins* and *Ellmaker* for the plaintiff in error.

The court erred—1st. In charging that the relation of principal and surety continued after the judgment.

2. In allowing the jury not only to decide the facts, but also to determine whether in law they amounted to satisfaction of the judgment of *Whitehill*, as to *Wilson* or a discharge of him from it; and in telling them that *Wilson* in any event was entitled to a credit to the amount of the property of *Boyd*, which was levied on. At most he could but claim credit as a co-surety, for but one half of that sum.

1st. He contended that the relation of principal and surety, was merged in the judgment: by the judgment all become equally bound, and were alike principals. By the judgment it becomes a debt of record, which was not open to inquiry, and examination, while unreversed, and could not be contradicted. To this point is the decision in the case *Bay's adm'r.* v. *Talmadge*, 5 *John. Ch. Rep.* 305, where it is held, that after judgment, against principal and surety, there is an end of their relation, it is then too late to enquire into this antecedent relation, this is merged in the judgment. They referred also to *Sterling* v. *Marietta & Susq'hanna Trading Co.* 11 *Serg. & Rawle*, 179. *Lenox et al.* v. *Prout*, 3 *Wheaton*, 520. *The Commonwealth for the use of Bellas* v. *Miller's adm'r.* 8 *Serg. & Rawle*, 452, did not interfere with this principle. That was a case where the property of the principal was discharged from the levy of an execution, and it was held to discharge the sureties *pro tanto.* He referred also to *Lichtenthaler* v. *Thompson* 13 *Serg. & Rawle*, 159. *Geddis* v. *Hawk*, 10 *Serg. & Rawle*, 33, 39. *Irvine & Co.* v. *Kean*, 11 *Serg.* & *Rawle*, 280, 3 *Wheaton Rep.* 156, in notes.

2. *Wilson* was not discharged by discharging the property of *Boyd* from the execution.

Where two are bound jointly and severally a release of one will discharge both, but a covenant not to proceed against one will not have that effect, although it be given on the receipt of part of the

(Whitehill *v.* Wilson.)

money due from him, nor will equity extend a release which does not amount to a technical release at law, beyond the clear intention of the parties, and the justice of the case. *Rowley* v. *Stoddard,* 7 *John. Rep.* 207, 6 *John. Ch. Rep.* 242.   Here there is no evidence of any agreement between *Whitehill* and *Wilson,* nor was there any intention to discharge him.   They referred also to *Patterson* v. *Swan,* 9 *Serg. & Rawle,* 16, 20.   *Gro et al.* v. *The Huntingdon Bank,* 1 *Penn. Rep.* 425, 2 *Showers,* 394, 5 *Bur.* 272. *Bucher* v. *The Commonwealth,* 1 *Rawle,* 357.

*W. Hopkins,* and *Hopkins,* with whom was *Champneys,* for the defendant in error,

Contended that it appeared to be the manifest intention of *Whitehill* to release *Boyd,* of which the evidence was partly in writing, and partly by parol, and it was therefore the duty of the judge to submit the question to the jury.   If the counsel for the defendant had wished for the charge of the court upon the written evidence, they should have framed a suitable point for that purpose.   *Sedwell* v. *Evans,* 1 *Penn. Rep.* 383.   *Rouvert* v. *Patton,* 12 *Serg. & Rawle,* 253. *Munderbach* v. *Lutz's adm'r.* 14 *Serg. & Rawle,* 220.

The release of one of two joint debtors is the release of both. *Whar. Dig.* 247. *pl.* 3.   *Milliken* v. *Brown,* 1 *Rawle,* 398. The jury from the testimony were at liberty to decide that the discharge which *Whitehill* spake of, applied to this judgment, and if necessary that it was made upon a valuable consideration, or even that it was under seal, but the counsel for the defendant did not raise these points in the court below.

If the judgment did extinguish the relation of principal and surety, a release of one joint principal is a release of all; but the judgment has not this effect.   *The Commonwealth for Bellas* v. *Miller's Adm'r.* 8 *Serg. & Rawle,* 452.   *King* v. *Baldwin,* 17 *John. Rep.* 391, 393, 395.

In the case of *Bullet's Ex'r.* v. *Wenston,* 1 *Munford,* 269, "issuing a *fi. fa.* levying on the goods of a co-surety, and directing the sheriff to postpone the sale until after the return of the writ, and to leave them in the possession of the owner; who afterwards disposed of them was held to discharge the other surety.   This of course was after judgment, and it was not even made a question, whether the judgment in any way changed the relation of principal and surety?

In the case of *Leonard* v. *Proul,* relied on by the counsel of the plaintiff in error, was not decided on the ground of a judgment having been obtained, but upon a protest and notice of non-payment in a mercantile transaction, where promptness and punctuality are considered of so much moment.   Here the endorser was fixed ab-

solutely for the payment of the money by the protest, and notice of non-payment. The reason assigned by Chancellor *Kent,* for his opinion, that a judgment merged the relationship of principal and surety, because the fact cannot be enquired into, is inconclusive; for if the surety is compelled to pay the money, he may recover it from his principal, or he will be entitled to an assignment of it. The question was placed upon the true ground by the Chief Justice in *Sterling* v. *The Marietta & Susq. Com.* 11 *Serg. & Rawle,* 179. They referred also to *Chitty on Bills,* 371. Whenever for a valuable consideration the creditor puts it out of his power to proceed against the principal, or in any respect increases or changes the responsibility of the surety, without his consent, the surety is discharged.

The opinion of the court was delivered by

GIBSON, C. J.—Two of the three points made at the trial, were ruled in favor of the plaintiff in error; consequently our attention is to be restrained to the third which presents a question arising out of, not the equity of a surety, but the supposed legal right of a co-defendant to be released from a judgment by the operation of acts thought to be a release of his fellow. The circumstances were shortly these. The judgment creditor had levied the property of the principal debtor, as well as that of the two sureties, who are principals as regards each other, when *Babbet,* a friend to one of the sureties *(Boyd,)* desired the creditor to release *Boyd.* Six weeks afterwards, the creditor told *Babbet,* "he thought he had got that matter fixed." At the time of the levy, *Boyd* complained that it would bring his other creditors upon him; on which the creditor gave him a certificate that his property was clear of any levy made by him, saying at the same time that it might be kept secret; and shortly afterwards gave written instructions to the sheriff to sell the property of the principal, and of *Wilson* the other surety, but to consider the property of *Boyd* as not subject to the levy. This was left to the jury with a direction that if the declaration of the creditor to *Babbet,* related to "the orders he had given, relieving *Boyd's* property *from the levy,* it would be a discharge of *Wilson* to that amount, and that he would be entitled to a credit for it on the judgment: that if he declared and meant to declare that he had discharged *Boyd* altogether, it would operate as a discharge of *Wilson* to the same extent." The fact thus left to the jury, it will be perceived, was the supposed reference of the declation in one aspect to the revocation of the levy, or in another to an intent to release the surety altogether, the rest being delivered as a conclusion of law, the soundness of which remains to be examined.

That a judgment may be released at law, by any thing less than a specialty, is not pretended. But a parol release is sufficient in equi-

(Whitehill *v.* Wilson.)

ty; and hence perhaps a misconception of its operation in suppos-
ing it to be immediate and direct.   In this respect, as in all others,
equity produces its peculiar results, not by controlling the princi-
ples of the common law, but by compelling the parties to put the
transaction into such a form as will bring it under the operation of
the rule of law originally intended to govern it; and in thus com-
pelling them to give entire effect to their agreement, according to
the true meaning, it performs the office of a handmaid to the law,
but without power even to abate its rigor, being equally bound to
submit to those venerable maxims *quae relicta sunt et tradita,* 3
*Comm.* 430—6.   Thus the assignment of a chose in action which
is void in law, is supported in equity by treating it as an agree-
ment for the assignee to use the name of the assignor to recover the
possession, and executing it as a declaration of trust accordingly.
*Co. Lit.* 232 *b note.*   On the same principle equity gives to a par-.
ol release not the abstract qualities of a specialty, but the effect of
an agreement not to sue, which it executes specifically by a perpet-
ual injunction.   But a consideration of some sort, is as necessary
to such an agreement, as to any other; and in this, it differs assen-
tially from a release by deed which imports a consideration from the
very solemnity of the act.   It is EXECUTORY in its very essence,
and therefore unlike a gift which, passing by manual delivery,
vests the property as against the donor, without any other consider-
ation than his own will, 1 *Fonb.* 329, 337, *note b.*   That a parol
executory contract, not mercantile, is *nudum pactam,* when un-
supported by a consideration, is a rudimental principle.   Even in
the case of a promissory note, want of consideration is constantly
set up between the original parties; *Pearson* v. *Garret,* 4 *Mod.*
442, *Jeffries* v. *Austin,* 1 *Stra.* 674, *Snelling* v. *Briggs, Bull.*
*N. P.* 274; and in *Tod* v. *Blair,* a voluntary extension of forbear-
ance to a principal though in writing, was held not to tie up the
creditor's hands, nor consequently to release the surety [See the
*United States* v. *Simpon, post.*]   In the case at bar, there was
neither evidence nor pretence of consideration, beyond the mere
benevolence of the creditor; and the direction would be without a
shadow of support were it not intimated in *Wentz* v. *Dehaven,*
1 *Serg. & Rawle,* 312, on the authority of *Lord Mansfield's dic-*
*tum,* in *Martin* v. *Mowlin,* 2 *Burr.* 979, that a parol gift or relin-
quishment of a mortgage debt, will release the mortgage itself,
without regard to the question of consideration or actual delivery.
It is obvious that *Lord Mansfield's* attention was occupied with
the disputed operation of the statute of frauds, instead of the neces-
sity of a consideration or delivery; and it is fair to intend that he
had in view a gift accompanied by all the incidents necessary to give
it validity.   He is therefore not authority for the broad position
that a debt by speciality or of record may be released without con-

(Whitehill v. Wilson.)

sideration and by parol; nor does the opinion of the judges in *Wentz* v. *Dehaven* go that far. The propriety of the judgment in that case, is not to be disputed, the release being in favor of a child; but it is less easy to subscribe to another point of doctrine asserted in it, that the delivery of the agreement in writing to the party intended to be benefitted, would have been a circumstance to cure a defect in the consideration, or perhaps to supply the place of it altogether. The paper though not under seal, was certainly thought to have a peculiar effect, in consequence of its being, as was said, *not a parol*, but a *written* declaration, the accuracy of which, I may with a sincere respect for the opinions of our learned and able predecessors, be permitted to controvert. In delivering the opinion of the judges in *Rann* v. *Hughes*, 7 *T. R.* 350, *note*, it is said by the *Chief Baron Skinner*, that "all contracts are, by the laws of *England*, distinguished into agreements by specialty, and agreements by parol; nor is there," he adds, "any such third class, as some of the counsel have endeavored to maintain, as contracts *in writing*. If they be merely written and NOT specialties, they are *parol*, and a consideration must be proved." This case is considered as having settled the law, being, as it was, determined by the unanimous opinion of all the judges in the house of Lords, where the authority of Mr. Justice *Wilmot's* celebrated argument in *Pillans* and *Rose* v. *Van Mierop*, 3 *Burr.* 1663, if not of the case itself, was much and perhaps justly shaken. In *Wentz* v. *Dehaven*, the agreement, though in writing, was nevertheless parol and the delivery of the written evidence of it, could no more dispense with the necessity of a consideration, then could the delivery of a promissory note, dispense with it between the original parties, by operating as a gift of the money; for surely the form of the transaction, by which a person is to part with his property—whether by a creation of a new debt, or the extinction of an old one—cannot be thought to make a difference. Neither could it change the executory nature of the agreement, as being a symbolical delivery of the mortgage or bond accompanying it, which ought itself, as being the proper muniment of the title, to have been delivered up or cancelled. *Richards* v. *Lyms*, 2 *Eq. Ca. Abr.* 617. To deliver to the donee, a memorandum of the gratuitous transfer of a bond retained by the donor, would no more pass the property in it, than would the gift of any other chattel in the same circumstances; and a gift of the debt to the obligor must certainly depend on the same principles. Whatever then may be the facility of proof, or certainty of intent, afforded by a written declaration, it can, if unsealed, have no *peculiar* or greater effect than if it were merely verbal. It is proper to repeat, however, that independent of aid, borrowed from the writing, the judgment in *Wentz* v. *Dehaven*, stands clear of doubt or difficulty.

(Whitehill *v.* Wilson.)

In the case before us, there was not even a written declaration; and it was error to charge that an intent to release *Boyd*, would release *Wilson* also: there was no pretext to say that either was released.

But there was in truth no evidence of an intent to release *Boyd*, or even to favor him further than to postpone a call on him for satisfaction, while there was a prospect of obtaining it elsewhere, which might well be done without jeoparding the right to have recourse to the other defendants; consequently there was nothing to submit. *Babbet* had used the word "release" in his request to the creditor, but probably in no definite sense. The creditor never used it at all; and we must recur to his acts for his meaning in saying "he thought he had got that matter fixed." He said, not what he then did or intended to do, but what he *had* done—withdrawn the levy from *Boyd's* goods. But, it is said, the jury were to judge of that; and for this is cited *Sidwell* v. *Evans*, 1 *Penn. Rep.* 383. There, however, no more was determined than that a judge is not bound to attribute a legal effect to words spoken by a witness in a question of fact; which is certainly a distinct thing from his right to submit to the jury a question which does not arise out of the evidence. To leave to them the finding of a fact without the color of proof, is certainly error. We come then to the revocation of the levy, of which there was undoubted evidence. Seizing the goods of the debtor in execution, is *ipso facto* satisfaction, as was held in *Hunt* v. *Breading*, 12 *Serg. & Rawle*, 37; but the immediate parties may choose to consider it otherwise, as was held in *The Commonwealth* v. *Miller's Admin'r*. 8 *Serg. & Rawle*, 457. By the removal of the seizure, then, the levy ceased to be satisfaction as to *Boyd*; and why not as to *Wilson?* Where the creditor suffers the means of satisfaction to slip from his hands into those of the principal debtor, equity releases the surety. But *Wilson* and *Boyd* were not in the relation of principal and surety, being as between themselves, both principals; and the creditor was not bound to pursue his seizure of the goods of either for the benefit of the other. In contemplation of the law, all the defendants make but one party, and where the equity of a surety does not intervene, the plaintiff may treat them alike or take satisfaction from any of them at his pleasure. In every point of view, then, this part of the case was put erroneously to the jury.

HUSTON, J. dissented.

ROGERS, J. took no part having been of counsel in the cause.

Judgment reversed and a *venire de novo* awarded.